**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

JUNG JAE HYUNG, Derivatively on Behalf of EOS ENERGY ENTERPRISES, INC.,

Plaintiff,

v.

JOSEPH MASTRANGELO, NATHAN KROEKER, RUSS STIDOLPH, JEFF BORNSTEIN, CLAUDE DEMBY, ALEX DIMITRIEF, and MARIAN WALTERS,

Defendants,

and,

EOS ENERGY ENTERPRISES, INC.,

Nominal Defendant.

Case No:

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Jung Jae Hyung ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Eos Enterprises, Inc., Inc. ("Eos" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, documents produced pursuant to Section 220 ("Section 220") of the Delaware General Corporation Law ("DGCL"), and matters of public record.

**NATURE OF THE ACTION**

1. This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that have occurred from May 9, 2022 through the present (the "Relevant Period") and have caused substantial harm to the Company.

**JURISDICTION**

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9). This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) Defendants have received

substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

5. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

6. Plaintiff is, and was at relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

7. ***Nominal Defendant Eos*** is incorporated under the laws of Delaware with its principal executive offices located in Edison, New Jersey. Eos's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the symbol "EOSE" and its warrants trade under the symbol "EOSE."

### Director Defendants

8. ***Defendant Joseph Mastrangelo*** ("Mastrangelo") has served as the Company's Chief Executive Officer ("CEO") since August 2019 and as a Board of Director ("Board") advisor since March 2018.

9. ***Defendant Russell Stidolph*** ("Stidolph") has served as a director of the Company since 2018. Defendant Stidolph also serves as the chair of the Compensation Committee and a member of the Nominating and Corporate Governance Committee.

10. ***Defendant Jeffrey Bornstein*** ("Bornstein") has served as a director of the Company since September 2022. Defendant Bornstein also serves as the chair of the Audit Committee and a member of the Compensation Committee.

11. ***Defendant Claude Demby*** ("Demby") has served as a director of the Company since August 2021. Defendant Demby also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

12. ***Defendant Alex Dimitrief*** ("Dimitrief") has served as a director of the Company since November 2020. Defendant Dimitrief also serves as the chair of the Nominating and Corporate Governance Committee and a member of the Audit Committee.

13. ***Defendant Marian Walters*** ("Walters") has served as a director of the Company since November 2020. Defendant Walters also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

14. ***Defendant Audrey Zibelman*** ("Zibelman") was a Company director from 2020 through to 2024.

15. Defendants Stidolph, Bornstein, Demby, Dimitrief, Mastrangelo, Walters, and Zibelman are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

16. ***Defendant Nathan Kroeker*** ("Kroeker") has been the Company's Chief Financial Officer ("CFO") since January 23, 2023.

17. The Director Defendants and Defendant Kroeker are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background**

18. Founded in 2008 and headquartered in Edison, New Jersey, the Company claims it designs, develops, manufactures, and markets zinc-based energy storage solutions for utility-scale, microgrid, and C&I applications.

19. The Company is the surviving entity after Eos Energy Storage, LLC was acquired in a business combination by a special purpose acquisition company ("SPAC") called B. Riley Principal Merger Corp. II on November 16, 2020 (the "Business Combination").

20. As the Company was not profitable, it touted its booked orders to the market. In fact, both before and after the Business Combination, the Company announced each newly booked orders and included booked orders and order backlog in its quarterly financial highlights. Moreover, the Company's executives would routinely talk about order backlog in earnings calls, often before any other financial information about the Company, and would specifically respond to analyst questions about it.

21. The Company's order backlog was vital to the future of the business as it demonstrated market interest in the Company's products. As such, the Company's executives were finely attuned to the details of the transactions that were announced by the Company and were included in the Company's order backlog. In fact, the Company's backlog was used by Defendants to raise funds and increase the stock value. Defendant Kroeker confirmed management's attention to backlog when he stated in an August 15, 2023 earnings call that:[1]

> ***Each quarter, we assess the health of our reported backlog.*** Doing so requires us to exercise judgment about uncertain factors. We sometimes come to the view that a project that was booked in the past is unlikely to materialize or a change order has been executed, in which case, we may adjust our backlog. This assessment has resulted in projects being removed from our backlog in each of the last 2 quarters.

---

1 All bold and italicized emphasis hereinafter is added otherwise noted.

22. Moreover, the Individual Defendants were certainly aware of the specifics of the Company's backlog because it reflected so few customers. Specifically, the entire backlog only had 13 customers (and the Company had only shipped products to 12 customers in its history). As Defendant Kroeker explained during the August 15, 2023 earnings call:

> While we've previously shipped products to 12 customers, our current backlog consists of 13 customers representing 2.2 gigawatt hours, which includes a mix of ultimate, developers, IPP's and industrial customers.

**Soon After the Business Combination, Iceberg Accused the Company of <u>Inflating Its Backlog With Customers That Were Unlikely To Fulfill Their Contracts</u>**

23. On January 14, 2021, Iceberg issued a research report entitled "EOS Energy […]: Fake Customers won't Recharge a Dead Battery." In the research report, Iceberg stated that the Company had only sold ten battery systems to customers since 2008 but reported an incredible surge in its order book just before the Business Combination. According to the report, this surge was attributable to companies that were unlikely to honor their obligations with the Company because they did not appear to have the funds to finance them. The research report stated:

> **Behind EOS' announcements of huge contracts are companies unlikely to honour their obligations**
>
> EOS was clearly struggling before the SPAC merger, having sold just ten battery systems to customers since 2008, representing a total of 3 MWh (the modest equivalent of 13 Tesla Powerpacks). Many of these battery systems were installed under pilot programs to test EOS' technology.
>
> EOS has shown little commercial success, and if not for the merger, was unlikely to survive for more than a few months without raising additional capital. Auditor Deloitte highlighted in the company's FY19 financial statements that EOS "has stated that substantial doubt exists about the Company's ability to continue as a going concern."
>
> Indeed, EOS has burnt $160m of investor monies over its 12 years of existence, and had just $6.5m cash on hand at the end of September 2020. Its recent performance for the first nine months of 2020 ("9M20") was not any better as 9M20 revenue plunged ~83% to $35k from $211k a year earlier. Its 9M20 net loss was $45m while equity was negative $229m.

> However, lo and behold, EOS miraculously announced a flurry of customer commitments just before the SPAC merger. This brought EOS' order book to 3,000 MWh at the end of October, a thousand times its existing deployment of batteries.
>
> * * *
>
> However, there is one problem with this rosy scenario: EOS has signed contracts with customers that are unlikely to have the financial ability to pay for these contracts. Three named customers — which combined account for 1,680 MWh — in particular explain EOS' exploding orderbook: **Carson Hybrid Energy Storage** ("CHES"), **International Electric Power, LLC** ("IEP"), and **EnerSmart Storage LLC** ("EnerSmart"). […].

24. The Iceberg report stated that these companies did not appear to be legitimate and had not acquired funding yet for these transactions. For instance, in regard to International Electric Power, LLC ("IEP"), Iceberg stated:

> EOS' largest customer IEP calls itself a "technology agnostic power producer which seeks to build, own and operate a portfolio of generation assets." Its website does not list any manager despite claims that "our senior managers have over 30 years of industry experience." We found this information on a hidden old web page: out of four managers, at least two have left the company. And while IEP was involved in energy projects in the mid-2015s, it does not seem to have been really active since then.
>
> EOS has agreed to supply IEP with 1 GWh of battery energy storage systems in connection with the Electric Reliability Council of Texas ("ERCOT") grid. We found no trace of IEP on the ERCOT website nor did we find any relationship between ERCOT and IEP. A press article reports: "IEP is yet to identify the exact locations where the systems will be sited." We wonder how IEP can order 1GWh of batteries if they don't know yet where to put them.

25. On this news, the Company's stock price fell 13.6% to close at $24.56 per share on January 14, 2021.

26. Following the issuance of this Iceberg report calling into question certain of the Company's customers' legitimacy and ability to fund transactions, it would have been severely reckless for the Individual Defendants not to have been actively monitoring its largest customer's ability to pay for its booked orders with the Company.

**MATERIALLY FALSE AND MISLEADING STATEMENTS AND THE MARKET'S REACTION**

27. On March 9, 2022, the Company announced the largest deal in the history of the Company. As the Company stated in a press release that day, it had entered into a deal with Bridgelink Commodities representing a total order value of up to $150 million, or nearly 75% of the Company's backlog. The press release entitled "Eos Energy Enterprises Secures Record-Breaking Order from Bridgelink Commodities, LLC" stated:

> Eos Energy Enterprises, Inc. (NASDAQ: EOSE) ("Eos"), a leading provider of safe, scalable, efficient, and sustainable zinc-based energy storage systems, today announced it entered into a master supply agreement with Bridgelink Commodities, LLC ("Bridgelink") for proposed storage projects across Texas. ***Bridgelink has committed to purchase 240 MWh of energy storage capacity provided by Eos's Znyth™ zinc-based technology, accompanied by an option to purchase long-term maintenance support, with an additional option to expand to a total of 500 MWh over a term of 3 years, representing a total order value of up to $150 million.*** Bridgelink, which has over 8 GW of renewable generation projects in development, will rely on Eos technology to support energy curtailment recapture, providing resilience to the local power grid overseen by the Electric Reliability Council of Texas ("ERCOT").
>
> * * *
>
> "***With this partnership, our backlog grows to more than $200 million and is rapidly approaching 1 GWh.*** We continue to make real progress towards our $400 million booked order target for 2022 with a commercial opportunity pipeline of more than $4 billion," said Balki Iyer, Chief Commercial Officer of Eos.

28. On May 9, 2022, the Company filed its Form 10-Q with the SEC for the quarter ended March 31, 2022. Therein, the Company stated in its "Company Highlights" section:

> In March 2022, the Company entered into a master supply agreement with Bridgelink Commodities, LLC ("Bridgelink") for storage projects across Texas. Bridgelink has committed to purchase 240 MWh of energy storage capacity provided by Eos's Znyth™ zinc-based technology, accompanied by an option to purchase long-term maintenance support, with an additional option to expand to a total of 500 MWh over a term of 3 years, representing a total order value of up to $150 million.

29. On May 10, 2022, the Company issued a press release entitled "Eos Energy Enterprises Reports First Quarter 2022 Financial Results." Therein, the Company stated:

> Eos Energy Enterprises, Inc. (NASDAQ: EOSE) ("Eos"), a leading provider of safe, scalable, efficient, and sustainable zinc-based energy storage systems, today announced financial results for the first quarter ended March 31, 2022.
>
> **First Quarter Highlights**
>
> - ***Continued commercial pipeline growth; booked orders of $67 million year-to-date resulting in orders backlog of $212 million with a current opportunity pipeline of over $6 billion.***
>
> **Recent Business Highlights**
>
> * * *
>
> - ***In March 2022, Bridgelink Commodities, LLC signed a three-year master supply agreement with a total potential order value of up to $150 million. Minimum order commitment under the agreement for 240 MWh with an option to increase to 500 MWh and an additional option to purchase long-term service support.***

30. Analysts took notice of the Bridgelink Commodities announcement. For instance, on May 10, 2022, Evercore ISI issued an analyst report about the Company entitled "Large Project Pipeline Increasing." Therein, Evercore reiterated its Outperform rating for the Company and noted:

> Building the Backlog. ***EOSE backlog grew to $212.4 million at the end of the first quarter, consisting of 827 MWh for 28 projects across 15 customers.*** The company booked orders of $67 million in Q1 while its current commercial opportunity pipeline grew to over $6 billion. Demand for energy storage continues to grow, while there is a shortage of supply for product given the challenging supply chains. This is leading to customers to approach them about use cases for its battery technology and the timeline around when they can get product to market. ***Customers are also approaching them earlier in the deal cycle, which allows EOSE to have better visibility.*** Its backlog is also benefitting from higher pricing, which is increasing pipeline value.

31. Similarly, on June 29, 2022, Guggenheim Securities, LLC issued an analyst report entitled "A Path Forward for EOS Energy." The report stated: "EOSE is scaling its manufacturing

efforts and still appears likely to emerge from this year with ~$500 million in backlog — which we view as a testament to the viability of the company's technology."

32. On July 6, 2022, the Company announced another deal with Bridgelink Commodities that increased its order value to $181 million. The press release announcing the transaction entitled "Eos Energy Enterprises, Inc. Secures Over 1 GWh in New Orders, More Than Doubles Backlog to Over $460 Million" stated:

> Eos Energy Enterprises, Inc. (NASDAQ: EOSE) ("Eos"), a leading provider of safe, scalable, efficient, and sustainable zinc-based energy storage systems, today announced the signing of two significant orders with Bridgelink Commodities, LLC ("Bridgelink") and a leading Northeast solar developer totaling 1.1 GWh of energy storage capacity to be delivered over the next three years.
>
> ***Bridgelink increased its multi-year master supply agreement ("MSA") to 1 GWh for deliveries over the next three years with an incremental order value of $181 million for new project installations. In addition, Eos will manufacture a separate 40MWh order valued at $13 million for fourth quarter 2022 delivery.***
>
> "We've built a strong working relationship with Eos and are proud to bring American-made technology to the ERCOT market in Texas," said Bull Flaherty, Managing Director at Bridgelink. "Eos' technology allows us the flexibility to meet the growing demand profile of ERCOT and bring more power to US consumers when needed."
>
> * * *
>
> "Over the past six months our opportunity pipeline increased to more than 20GWh, and we are excited to start seeing those opportunities convert into orders," said Joe Mastrangelo, CEO of Eos. "These orders fit perfectly with our ongoing manufacturing capacity expansion which we began late last year. Growing our relationship with customers like Bridgelink demonstrates how our flexible technology allows our customers to serve a variety of use cases."

33. On July 6, 2022, Evercore ISI, issued another analyst report that focused on backlog. That report entitled "Backlog More Than Doubles; Momentum Accelerating" stated:

> Not An R&D Project; This Is An Operating Business. Despite many battery and battery storage entities which remain in trial phases EOS is an operating business that is scaling its manufacturing capacity in-line with rapidly growing customer demand. ***The company was awarded two significant orders from Bridelink [sic] affiliates including an increase to the companies' MSA to 1 GWh ($181 million)***

> ***to be delivered over the next three years plus a 40 MWh order for $13 million to be delivered in 4Q22. This equipment is destined for the ERCOT market in Texas***. In addition, a 300 MWh MSA was added for front of the meter stand-alone storage plus solar applications with a leading Northeast solar developer. As we alluded to in our takeaways note from our recent Clean Energy & Transition Technologies Summit we believed the company was on the cusp of several major new awards. ***The company experienced an acceleration in its pipeline doubling in the last six months (to more than 20 GWh)*** and is scaling up its manufacturing capacity (160 employees outside of Pittsburg) from 250 to 800 MWh capacity for long term secular growth. The factory is a place where customers can visit an operating company and see it is not a technology development company; a key differentiated in the rapidly developing battery storage market.

34. That same day, Seaport Research Partners issued an analyst report that focused on the Company's backlog entitled "EOSE wins Bridgelink MSA expansion that more than doubles backlog, appears at another politically-positive event -- both bullish," recognizing: "Today, EOSE announced 1.1 GWh of new awards that have taken its order backlog to over $460MM, up more than 115% from its end-1Q22 level of $212.4MM."

35. On August 1, 2022, the Company filed its Form 10-Q with the SEC for the quarter ended June 30, 2022. Therein, the Company stated in its "Company Highlights" section:

> In March 2022, the Company entered into a master supply agreement with Bridgelink Commodities, LLC ("Bridgelink") for storage projects across Texas (the "Bridgelink MSA"). Bridgelink committed to purchase 240 MWh of energy storage capacity provided by Eos' Znyth™ zinc-based battery technology, accompanied by an option to purchase long-term maintenance support, with an additional option to expand to a total of 500 MWh over a term of 3 years, representing a total order value of up to $150 million.
>
> * * *
>
> In June 2022, Bridgelink Commodities, LLC increased the Bridgelink master supply agreement to 1 GWh of energy storage systems for deliveries over the next three years with an incremental order value of $181 million for new project installations and also issued a separate 40 MWh order valued at $13 million for fourth quarter 2022 delivery.

36. On August 2, 2022, the Company issued a press release entitled "Eos Energy Enterprises Reports Second Quarter 2022 Financial Results." Therein, the Company stated:

Eos Energy Enterprises, Inc. (NASDAQ: EOSE) ("Eos"), a leading provider of safe, scalable, efficient, and sustainable zinc-based energy storage systems, today announced financial results for the second quarter ended June 30, 2022.

**Second Quarter Highlights**

- $5.9 million in revenue, a 79 percent sequential increase and 28 percent higher compared to full year 2021 revenue.

- Booked orders in second quarter of $257.5 million, almost 4x higher than first quarter; year-to-date booked orders now stands at $324.7 million.

- ***Orders backlog more than doubled in the quarter to $457.3 million.***

37. On August 2, 2022, Evercore ISI also issued an analyst report that focused on the Company's backlog growth, explaining that the Company was a "compelling investment" because of its "strong backlog growth" and valuable technology. The report entitled "Backlog Building, Revenue and Earnings Growth On The Come" stated:

> ***Backlog Surging.*** We continue to view EOSE as a compelling investment in the major energy storage theme, ***driven by strong backlog growth*** and an established long-duration technology capable of outperforming lithium-ion solutions. . . .
>
> ***Strong Orders. EOSE's backlog grew to $457.3M (vs. $212.4M in 1Q), representing ~1.9GWh. The company booked orders of $324.7M compared to $67.1M in 1Q while its opportunity pipeline increased to $7.0 billion, representing 27GWh***. While energy storage demand grows globally, renewable developments slowed due to inflation and global supply chain constraints which resulted in an increased competition to secure lithium for battery production. However, EOSE's unique zinc based energy storage systems and supply chain network that utilizes 85% domestic products allowed the company to be less susceptible to cost inflation and to be ready to deliver products on time. This should allow EOSE to continue capturing market share. Visits to the Turtle Creek facility (which is running, and expanding) are helping to deliver orders. We plan to visit ourselves in a few weeks.

38. On August 3, 2022, Guggenheim Securities, LLC also issued an analyst report that noted Eos's success in new bookings. The report entitled "EOSE: Steps in the Right Direction" stated:

> Good operational progress. EOS Energy reported continued operational progress

> during the June quarter, booking $257 million in new business and shipping ~$6 million in product for revenue. When we visited the company recently, we came away convinced that the company could exit 2022 with close to $500 million in backlog. Given the additional progress this quarter, our estimate for end-of-year backlog now stands at close to $600 million. ***EOS has added Bridgelink Commodities to its list of customers, with two orders totaling 1.1GWh to be delivered over the next 3 years. For context, our model shows a total of 2.4GWh in deliveries between now and the end of 2024, so the Bridgelink news is significant.*** EOSE says that it has 536MWh in annualized manufacturing capacity in place currently, and we see the company exiting this year at 800MWh and next year at 1.3GWh, so the pieces are in place for EOSE to meet the demand it is generating.

39. On October 27, 2022, the research firm EF Hutton initiated coverage of the Company because the "fully booked orders in excess of $450M" indicated the Company was a compelling investment. The report entitled "EOSE: Giving Zinc a Think; Initiating With Buy Rating, $3.50 Price Target" stated:

> Eos Energy Enterprises is a differentiated play on energy storage (flexible intraday discharge, non-Li-ion technology, domestic supply chain/operations). While we expect near-term results to likely be impacted by pending IRA subsidies and introduction of a transformational next-generation product redesign, positioning the company for profitable deployments at scale, we like risk/reward at these levels (we would play for more binary potential on trajectory in 2024-25 vs. upcoming quarters). We also see clear catalysts for near-term stock movement, including potential finalization of DOE funding;
>
> we favor the chances currently. Strong secular trends. We view the energy storage market as a massive secular growth opportunity, noting a clear need for alternatives to Li-ion technologies. Here, Eos offers a proprietary technology focused on four-hour-plus and flexible stationary applications, with a fully recyclable, non-flammable and non-toxic solution. The company was founded 14 years ago and has been perfecting the technology since. ***Importantly this is not a science project, as systems are being sold and are in operation, with fully booked orders in excess of $450M.***
>
> * * *
>
> In March 2022, Eos entered into a master supply agreement with energy developer Bridgelink, committing to delivering on a company recordbreaking order of up to 500MWh (a 1.1 GWh total order) of Eos' zinc battery storage systems to be deployed at projects in Texas. In the agreement, Bridgelink Commodities (a division of Bridgelink focused on energy trading, operations, and maintenance activities) committed to purchasing 240 MWh of Eos Znyth battery storage

> technology with an additional option to expand to a total of 500MWh over a term of 3 years. The initial order project duration was between 3 and 8 hours, for a total value of $220 million. Bridgelink announced plans to use Eos' batteries to reduce curtailment of generated renewable energy and providing balancing and resiliency services to the Electric Reliability Council of Texas (ERCOT) grid. ***Eos was able to begin delivering on this commitment in the second quarter of fiscal 2022 given company investment in capital and domestic supply chain.***

40. On November 7, 2022, the Company filed its Form 10-Q with the SEC for the quarter ended September 30, 2022. Therein, the Company stated in its "Company Highlights" section:

> In June 2022, Bridgelink Commodities, LLC increased the Bridgelink master supply agreement to 1 GWh of energy storage systems for deliveries over the next three years with an incremental order value of $181 million for new project installations and also issued a separate 40 MWh order valued at $13 million.

41. On the same day, November 7, 2022, the Company issued a press release entitled "Eos Energy Enterprises Reports Third Quarter 2022 Financial Results." Therein, the Company stated:

> Eos Energy Enterprises, Inc. (NASDAQ: EOSE) ("Eos"), a leading provider of safe, scalable, efficient, and sustainable zinc-based long duration energy storage systems, today announced financial results for the third quarter ended September 30, 2022.
>
> **Third Quarter Financial Highlights**
>
> - Revenue of $6.1 million, $5.3 million higher than same period last year and slightly higher sequentially; 15% increase in Energy Block units revenue recognized vs. last quarter.
>
> - ***Current opportunity pipeline of $7.3 billion, a 5% increase quarter over quarter, with year-to-date booked orders of $324.8 million and orders backlog of $452.2 million.***

42. On February 28, 2023, the Company filed its Form 10-K with the SEC for the year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K was signed by Defendants

Mastrangelo, Kroeker, Bornstein, Dimitrief, Zibelman, Demby, Stidolph, and Walters. Therein, the Company stated in its "Company Highlights" section:

> In June 2022, Bridgelink Commodities, LLC increased the Bridgelink master supply agreement to 1 GWh of energy storage systems for deliveries over the next three years with an incremental order value of $181 million for new project installations and also issued a separate 40 MWh order valued at $13 million.

43. On the same day, the Company issued a press release entitled "Eos Energy Enterprises Reports Fourth Quarter and Full Year 2022 Financial Results." Therein, the Company stated:

> Eos Energy Enterprises, Inc. (NASDAQ: EOSE) ("Eos" or the "Company"), a leading provider of safe, scalable, efficient, and sustainable zinc-based long duration energy storage systems, today announced financial results for the fourth quarter and full year ended December 31, 2022.
>
> **Full Year 2022 Highlights**
>
> - Revenue of $17.9 million compared to $4.6 million in 2021, representing approximately 4x revenue growth year-over-year.
> - Increased current opportunity pipeline by 83% year-over-year to $7.5 billion, which includes 4GWh in LOIs.
> - Costs of Goods Sold of $153.3 million, driven by a 44% reduction in unit product cost year-over-year.
> - ***Booked orders increased 2.5x to $338.6 million resulting in an orders backlog of $463.8 million as of December 31, 2022 compared to orders backlog of $147.5 million as of December 31, 2021.***

44. On March 27, 2023, the Company filed the 2023 Proxy Statement with the SEC pursuant to § 14(a) of the Securities Exchange Act of 1934. The 2023 Proxy Statement was solicited by Defendants Stidolph, Bornstein, Demby, Dimitrief, Mastrangelo, Walters, and Zibelman and called for shareholder approval of, *inter alia*: (1) the reelection of certain Director Defendants to the Board; and (2) the ratification of the selection of the Company's independent registered public accounting firm for its fiscal year ending December 31, 2023; (3) the

compensation of the Company's named executive officers; (4) an amendment to the Company's Third Amended and Restated Certificate of Incorporation to update the exculpation provision; and (5) an amendment to the Company's Amended and Restated 2020 Incentive Plan.

45. The 2024 Proxy Statement contained the following information, in relevant part:

> **Code of Business Conduct and Ethics**
>
> Our Board of Directors has adopted a Code of Business Conduct and Ethics (the "Code") that applies to all officers, directors and employees. The Company intends to disclose any amendments to or waivers of certain provisions of the Code on its website at https://investors.eose.com within the time period required by the SEC and the Nasdaq.
>
> * * *
>
> **Role of the Board in Risk Oversight**
>
> Our Board oversees our risk management. Our Board, directly and through the Audit Committee carries out this oversight role by reviewing the Company's policies and practices with respect to risk assessment and risk management, and by discussing with management the risks inherent in the operation of our business. Our Compensation Committee reviews risks arising out of the Company's compensation policies and practices, which are monitored and mitigated on an ongoing basis. Any necessary adjustments are addressed in the Company's risk profile.

46. Under the direction and watch of the Director Defendants, the 2023 Proxy Statement was materially false and misleading because the above-referenced statements failed to disclose that Bridgelink Power, the parent company of Eos' largest customer, Bridgelink Commodities, defaulted on a secured loan facility and was embroiled in litigation with the lender to seize the parent's assets and that the foregoing threatened Bridgelink Commodities' commitment and ability to purchase Eos products. As a result, there was a material risk to Eos's backlog which was vital to the future of the Company, which was known, or should have been known to the Director Defendants in the exercise of prudent business judgment. As such, the foregoing statement in the 2023 Proxy Statement was a half-truth, meaning that the Director

Defendants were required to (yet failed to) include all additional information necessary to make the statement not misleading. *See* 17 C.F.R. § 240.12b-20. Furthermore, the Director Defendants' statement regarding the Company's Code of Conduct was materially false and misleading because the Director Defendants were not adhering to the Code of Conduct and were, in fact, acting in violation of the Code of Conduct.

47. As a result of the Director Defendants causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*: (i) to re-elect Defendants Stidolph, Bornstein, and Demby to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (ii) to approve, on an advisory basis, the compensation for the named executive officers; and (iii) to update the Company's exculpation provision which would provide "exculpation to officers of the Company 'to the fullest extent permitted by law.'"

48. On May 9, 2023, the Company issued a press release titled "Eos Energy Enterprises Reports First Quarter 2023 Financial Results." Therein, the Company, in relevant part, stated:

> Eos Energy Enterprises, Inc. (NASDAQ: EOSE) ("Eos" or the "Company"), a leading provider of safe, scalable, efficient, and sustainable zinc-based long duration energy storage systems, today announced financial results for the first quarter ended March 31, 2023.
>
> **First Quarter Financial Highlights**
>
> a. $8.8 million revenue, compared to $3.3 million in 1Q 2022, a 168% increase year-over-year.
>
> b. Cost of Goods Sold of $26.9 million, a decrease of 24% compared to 1Q 2022, representing a 25% reduction in product unit cost year-over-year.
>
> c. Operating expenses of $19.4 million remained flat year-over- year.
>
> d. $16.1 million cash balance on March 31, 2023, compared to $17.1 million on December 31, 2022.
>
> e. Booked $86.3 million in orders, ***resulting in an order backlog of $535.1***

***million as of March 31, 2023,*** an increase of more than 2.5x versus 1Q 2022.

49. On May 10, 2023, the Company held an earnings call to discuss Eos's 2023 fiscal first quarter results. Therein, Defendant Mastrangelo stated:

> Moving on to Page 4 on the operating highlights. You continue to see good progress. Commercially, I'll go through some more details on the pipeline in a future slide, but we continue to see the opportunity pipeline increase. We booked a large order for $87 million, nearly $87 million, and that ***brought our backlog up to $535 million with – representing 2.2 gigawatt hours of power***.
>
> * * *
>
> When you look at our current pipeline, current pipeline is up in Q2, and we signed over $500 million of LOIs. Now think again about how we think about the movement through our pipeline. We don't call it current pipeline unless we have a technical use case where we can provide a technical proposal to the customer, which then leads us to giving them a nonbinding financial quote, which that stands at $6 billion in and of itself. Our goal with that combined $7 billion is to then get customers to sign an LOI with us. So we get on the same side of the table with them and close the project out to allow them to generate revenue and allow us to put product out in the field. That stands now at $1.5 billion with 7 gigawatt hours of potential.
>
> ***We work through those. And when you think about the timing of LOI to firm commitment, you're working through various different aspects on commercial terms, permitting, land rights and interconnections to be able to get to a firm commitment that then goes into our backlog, which, as I stated earlier, stands at $535 million, up $71 million versus fourth quarter***.

50. The above-referenced statements were materially false and/or misleading and/or failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors: (i) that Bridgelink Power, the parent company of Eos' largest customer, Bridgelink Commodities, defaulted on a secured loan facility and was embroiled in litigation with the lender to seize the parent's assets; (ii) that the foregoing threatened Bridgelink Commodities' commitment and ability to purchase Eos products; (iii) that, as a result, there was a material risk to Eos's backlog; and (iv) that, as such, there was a material undisclosed risk to Eos's business, operations, and prospects.

## THE TRUTH IS REVEALED

**Iceberg Research Reveals That Eos' Largest Customer**
**Likely Did Not Have the Funding to Pay Eos for its Orders**

51. On July 27, 2023, during market hours, Iceberg published a report titled "62% Of $Eose's Backlog Is With Financially Distressed Bridgelink Whose Renewable Energy Assets Were Foreclosed And Auctioned Off In May." Therein, Iceberg explained that Bridgelink Power had defaulted on a secured loan facility approximately two months after Bridgelink Commodities had signed the first order with Eos and was embroiled in litigation with the lender to seize its assets. As Iceberg's report, in relevant part, explained:

> As a company with abysmal financials, the fate of EOS Energy Enterprises rests on its touted 2.2 GWh energy storage system backlog, which EOS valued at $535 million at the end of March 2023. On Twitter, those who pump the stock relentlessly use the backlog as their rallying cry.
>
> We are 100% confident that the backlog is fake. In the past, we exposed International Electric Power, LLC ("IEP"), a dubious counterparty that signed a 1 GWh contract. Ultimately, EOS had to provide financial assistance to facilitate the IEP purchase of a significantly scaled-down order.
>
> This unsettling practice persists till today. ***One customer, Bridgelink Commodities, accounts for half of EOS's backlog by MWh or ~62% ($331 million) of its total dollar value.*** The relationship with Bridgelink began in March 2022 with an initial order of up to 500 MWh, and later in June 2022, the contract was enlarged to 1 GWh. We decided to dig into this customer's background and uncovered a group whose assets were recently seized by a creditor and sold in an auction.
>
> In March 2022, its parent company Bridgelink Power ("Bridgelink") successfully closed a $200 million senior secured loan facility with private lender Crayhill Capital Management, receiving $26.3 million on the closing date.

FILED: NEW YORK COUNTY CLERK 04/26/2023 08:08 PM INDEX NO. 652029/2023
NYSCEF DOC. NO. 4 RECEIVED NYSCEF: 04/26/2023

(b) Initial Advance. On the Closing Date, on the terms and subject to the conditions of this Agreement (including the satisfaction or waiver of each of the conditions precedent set forth in Section 6.1 and Section 6.2), Lenders shall make an initial Advance to Borrower in the aggregate principal amount of Twenty-six million two hundred and sixty thousand nine hundred and fifty-three Dollars and eighty cents ($26,260,953.80) (the "Initial Advance"), which shall be funded in accordance with Section 2.4.

*Source: Senior Secured Loan Agreement and Forbearance Agreement dated 30 September 2022 –*

*(Extracted from the New York State Unified Court System website)*

After just two months, Bridgelink defaulted on the loan facility, as shown in documents filed with the New York Supreme Court in April 2023 [link omitted]. The outstanding loan balance was $40.7 million as of 20 September 2022.

(b) The Bridgelink Parties agree and acknowledge that:

(i) as result of the Specified Defaults and pursuant to Section 4.4(b) of the Existing Loan Agreement, interest on the Loan began to accrue at the Default Rate as of May 30, 2022; and

*Source: First Amendment to Senior Secured Loan Agreement and Forbearance Agreement dated 30 September 2022*

*(Extracted from the New York State Unified Court System website)*

Within the court filings is a letter from Crayhill to Bridgelink dated 30 September 2022. While the lender initially chose to enter into a forbearance agreement, this was quickly terminated after Crayhill discovered that Bridgelink had allowed 'multiple impermissible' claims on assets. Crayhill called this a 'blatant violation' of the loan agreement's terms.

After entering into the Forbearance Agreement, Knights Hill obtained lien searches on the Parent, the Borrower and each ProjectCo and discovered additional Events of Default (the "Additional Events of Default") not covered by Knights Hill's July 1, 2022 and August 9, 2022 notices (the "Previous Notices") and not disclosed by the Parent or the Borrower. The lien searches revealed that the Parent, the Borrower, and several ProjectCos have granted multiple impermissible Liens on their assets in breach of the Loan Agreement, including (x) the Collateral pledged to Knights Hill under the Loan Documents and (y) the Projects. These liens, which are identified on Exhibit A hereto, are in blatant violation of Sections 9.2, 8.19(a)(xiv), and 8.19(a)(xvii) of the Loan Agreement. The violation under Section 9.2, in turn, constitutes an immediate Event of Default under Section 11.1(b) of the Loan Agreement.

*Source: Letter from Crayhill to Bridgelink dated 30 September 2022 (Extracted from the New York State Unified Court System website)*

Crayhill then seized collateral through its fund Knights Hill Ireland II DAC.

Subsequently in April 2023, Crayhill advertised that Bridgelink's membership interests in various project companies were to be sold through a public auction (Pg 7).

**NOTICE OF PUBLIC SALE OF COLLATERAL**

Please take notice that (i) 100% of Bridgelink Renewable Energy Development II, LLC's membership interests in the following project companies (collectively, the "Subsidiaries"): Armadillo Solar, LLC (d/b/a Morning Glory Solar); Neal Solar, LLC; Old Hickory Solar LLC; Panther Solar, LLC; Skeeter Solar, LLC; Stark Battery, LLC; Switchgrass Solar, LLC; BT Solterra Solar, LLC; Rockefeller Solar, LLC; Cottonmouth Solar, LLC, and Bridgelink Cave Springs LLC as well as (ii) all of the assets of BT Solterra Solar, LLC, Rockefeller Solar, LLC, and Skeeter Solar, LLC will be offered for sale at a public auction under Section 9-610 of the Uniform Commercial Code as enacted in the State of New York and sold to the highest ***qualified bidder*** on Friday, April 28, 2023 at 10:00 a.m. (EST) at the law offices of Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY, 10020. The Subsidiaries own, operate, or conduct business related to solar power-generating and battery facilities.

This sale is held to enforce the rights of Knights Hill Ireland II DAC (the "Secured Party") under that certain Pledge Agreement, dated as of March 31, 2022 and that certain Security Agreement, dated September 30, 2022. The Secured Party reserves the right to reject all bids and terminate or adjourn the sale to another time, without further publication.

The sale will be held on an "**as is, where is**" basis, without any representations or warranties of any kind, whether express or implied. There is no warranty relating to title, possession, quiet enjoyment, or the like in this disposition. Secured Party reserves the right to credit bid at the auction and to assign its bid.

Interested parties who would like additional information regarding the collateral, the requirements to be a "qualified bidder", the terms of the sale, and/or the address for the due diligence website should contact Adil Sener or Alexander Heiman of PEI Global Partners LLC by phone at (212) 970-5100 or by email at Project_Denali_PEI@peigp.com.

*Source: April 2023 issue of Power Finance & Risk Magazine*

Bridgelink tried to prevent Crayhill from enforcing its rights by filing a lawsuit. However, despite its efforts, the auction proceeded as planned on 5 May 2023.

3. The temporary stay of the UCC Sale provided for in the Interim Order entered by the Court on April 27, 2023 [NYSCEF.Doc. No. 13] is lifted, and Defendants may proceed with the UCC Sale scheduled at 10:00 a.m. (ET) on Friday, May 5, 2023.

4. This Stipulation may be executed in counterparts and by PDF and/or facsimile signatures with the same force and effect as originals.

Dated: May 4, 2023
New York, New York

PRYOR CASHMAN LLP
*Attorneys for Plaintiffs*
*BridgeLink Engineering, LLC; BridgeLink Renewable Energy Development II, LLC; BridgeLink Renewable Energy Investments II, LLC; BridgeLink Renewable Energy Investments, LLC; BridgeLink Investments, LLC; BridgeLink Power Holdings, LLC; Cole Johnson; and Cord Johnson*

Dated: May 4, 2023
New York, New York

ALLEN & OVERY LLP
*Attorneys for Defendants*
*Knights Hill Ireland II DAC; Crayhill Principal Strategies Fund II LP; Crayhill Principal Strategies Fund US II-4 LP; and Crayhill Capital Management LP*

*Source: Stipulation to lift the stay of the UCC sale (Extracted from the New York State Unified Court System website)*

Following the auction, Bridgelink tried to seal the legal documents, presumably to conceal its disastrous financial situation. The judge rejected this request.

FILED: NEW YORK COUNTY CLERK 05/19/2023 04:48 PM INDEX NO. 652029/2023
NYSCEF DOC. NO. 28 RECEIVED NYSCEF: 05/19/2023

**SUPREME COURT OF THE STATE OF NEW YORK**
**NEW YORK COUNTY**

**PRESENT:** **HON. ARLENE P. BLUTH** *Justice* **PART** **14**

---------------------------------------------------------------------------------X

**INDEX NO.** 652029/2023

**MOTION DATE** N/A

**MOTION SEQ. NO.** 002

BRIDGELINK ENGINEERING, LLC,BRIDGELINK RENEWABLE ENERGY DEVELOPMENT II, LLC,BRIDGELINK RENEWABLE ENERGY INVESTMENTS II, LLC,BRIDGELINK RENEWABLE ENERGY INVESTMENTS, LLC,BRIDGELINK INVESTMENTS, LLC,BRIDGELINK POWER HOLDINGS, LLC,COLE JOHNSON, CORD JOHNSON

Plaintiff,

- v -

KNIGHTS HILL IRELAND II DAC, CRAYHILL PRINCIPAL STRATEGIES FUND II LP, CRAYHILL PRINCIPAL STRATEGIES FUND US II-4 LP, CRAYHILL CAPITAL MANAGEMENT LP,

Defendant.

---------------------------------------------------------------------------------X

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 002) 23, 24, 25, 26, 27 were read on this motion to/for SEAL.

Plaintiffs' motion to seal nearly the entire docket is denied.

*Source: Decision + order on motion (Extracted from the New York State Unified Court System website)*

52. Surprisingly, the Company had not disclosed that its largest customer was afflicted with any financial difficulties. As Iceberg pointed out:

> Nowhere has EOS disclosed this crucial information, whether through an 8-K filing, or any other means. Instead, EOS upped its Bridgelink "orders" from 500 MWh to 1 GWh in June 2022.
>
> We wonder how EOS can still present Bridgelink as a major client. The batteries ordered by Bridgelink were intended for renewable energy assets which have now been auctioned off. Yet, EOS continues to include Bridgelink in its backlog, and is likely to have made the same representations when applying for the Department of Energy loan.

53. On this news, the Company's stock price fell $0.83 per share, or 23.9%, to close at $2.65 per share on July 27, 2023, on unusually heavy trading volume.

**Individual Defendants Confirm That Bridgelink Commodities Does Not Have Financing For Its Projects With The Company**

54. On July 27, 2023, after the market closed, the Company confirmed that Bridgelink Commodities did not have financing for the purportedly firm orders in the Company's backlog, which is why Bridgelink Commodities was "actively seeking financing for energy storage projects covered by Eos's multi-year Master Supply Agreement." The Company's press release entitled "Eos Energy Enterprises Provides Preliminary Results & Issues Statement Regarding Its Customer Commitments and Backlog" stated:

> Eos Energy Enterprises, Inc. (NASDAQ: EOSE) ("Eos" or the Company"), a leading provider of safe, scalable, efficient, and sustainable zinc-based energy storage systems, today announced that it expects to record revenue of $0.2 million for the quarter ended June 30, 2023, as the Company transitions manufacturing to the Eos Z3™ battery, with expected second quarter gross margin to improve by 20% to 50% over the prior quarter, cash balance (excluding restricted cash) of $23.2 million as of June 30, 2023, and booked orders of $86.9 million for the first half of 2023.
>
> The Company also issues the following response to statements made about its customer backlog in external reports, republished and amplified on social media, regarding two of the Company's customers: International Electric Power, LLC ("IEP"), who was referred to as a "dubious counterparty", has partnered with Eos since 2020 to codevelop two energy projects in Texas, with Eos providing upfront funding that was repaid when the project secured financing. The first of these projects is currently scheduled to break ground later this summer with product shipments expected in 2023.
>
> The report also referred to legal proceedings involving multiple Bridgelink legal entities. ***The Company believes that its customer, Bridgelink Commodities, LLC, is a separate legal entity which is not implicated in the legal matters highlighted in today's statements. This customer, representing 45% of the Company's backlog, reconfirmed today that it continues to build pipeline and is actively seeking financing for energy storage projects covered by Eos's multi-year Master Supply Agreement.***
>
> Eos' commercial pipeline remains strong and continues to grow in line with independent third-party market forecasts. The Company believes its long-term

> business fundamentals are strongly supported by the secular shift occurring in the energy industry requiring long duration energy storage.

55. The Company's assertion that the loan default and legal action against the parent company do "not implicate" Bridgelink Commodities is belied by the concession that Bridgelink Commodities was "actively seeking financing" for its orders with the Company. Notwithstanding that they are separate legal entities, the fact that a parent company going into default over $40 million makes it less likely that the subsidiary would be able to fund more than triple that amount of transactions in the near future.

56. On this news, the Company's stock price fell $0.39 per share, or 14.7%, to close at $2.26 per share on July 28, 2023, on unusually heavy trading volume.

57. Thereafter, on August 15, 2023, the Company held its earnings announcement for its 2023 fiscal second quarter. Defendant Kroeker again confirmed that Bridgelink Commodities did not have financing for its projects with the Company and that they were "actively seeking alternative financing for these projects." As Defendant Kroeker explained:

> We were informed by Bridgelink management that its affiliate has reached a confidential settlement with its lender, and the related assets were not sold at auction. Bridgelink recently confirmed that they are actively seeking alternative financing for these projects.

## THE FINANCIAL RISKS TO BRIDGELINK POWER IMPACTED BRIDGELINK COMMODITIES

58. The operations of Bridgelink Power and its subsidiaries are intertwined and controlled by the same individuals. Bridgelink Power's website claims that "Bridgelink is a diversified organization that has built a strong reputation and portfolio of companies in the energy industry. We leverage our expertise and knowledge to deliver premier power infrastructure and financial performance."

59. According to the website for one of these subsidiaries, Cole Johnson leads the "Bridgelink family office" and the "The Bridgelink family office has been operating since 2012 as a successful investment organization within the renewable energy sector."[2] In fact, the subsidiary explained the Bridgelink umbrella as follows: "Bridgelink is a diversified family office that has built a strong reputation and portfolio of companies in the energy and power sectors. We leverage our expertise and knowledge to deliver premier customer experiences and financial performances." Moreover, in the section about the leadership team, the Company explained how the Bridgelink entities were all part of a unified "family office" under Mr. Johnson's control:

> Cole has nearly two decades of executive experience in the energy space and sits on multiple boards. He serves as Chairman & CEO of Bridgelink Investments and concentrates on strategic growth for all entities. During the growth process of all entities, Cole played a major role in the day-to-day growth of each asset.
>
> In January of 2019, Cole transitioned to focus on growing the family office and development portion of the business. The family office now holds a total of $220M of assets and company shares. This valuation is expected to triple in size due to the contracts and the backlog of projects secured for 2021 and 2022. Bridgelink Investments is well-positioned to expand over the next 10 years as a leading development and investment company.
>
> Under Cole's leadership as Chairman, he has led the development team to a pipeline backlog of over 8GW of power to come online in the next 36 months throughout the U.S. This is in addition to two major commercial land development projects and a midstream asset projected to have an estimated value of over $100M by the year 2022.
>
> Cole has shown the oversight to lead the Bridgelink family office from a few million-dollar investments, to well on its way to having over $1B under management by 2023.

60. Details from litigation against the Bridgelink entities underscores that the significant overlap in the corporate structure. In late 2021, XL Specialty Insurance Company sued a number of related Bridgelink entities, including Bridgelink Commodities, and the individuals

---

2 https://bridgelinkinvestments.com/#our-services.

that run these entities, for failing to provide collateral pursuant to the indemnification agreement in late 2021. The Verified Complaint in that action demonstrates that each of these purported unique entities had the same address (777 Main Street, Fort Worth, Texas), chairman (Cole W. Johnson), and chief financial officer (Cody Bissett). In fact, the Verified Complaint itself and the indemnification agreement attached thereto, stated that each of the Bridgelink entities and Cole Johnson himself had agreed to be held "jointly and severally" liable as indemnitors in the transaction at issue. *Id.* That Bridgelink Commodities was financially responsible for the indemnity along with other subsidiaries of Bridgelink Power shows that the financial instability of the parent was reasonably likely to affect Eos's customer's ability to finance the contract.

61. In fact, an arbitrator has already found that Bridgelink Power and Bridgelink Commodities were jointly and severally liable for significant cost related to the litigation risk that was revealed in the Iceberg report. According to the arbitrator's award, Advanced Energy Capital LLC "successfully identified and introduced Bridgelink to Crayhill Capital Management ('Crayhill') and that Bridgelink has drawn tens of millions of dollars in capital funding from Crayhill." After determining that the Bridgelink entities were liable for paying a "success fee," the arbitrator had to determine which of the four named Bridgelink entities were liable for the award. The arbitrator ultimately found both Bridgelink Commodities and Bridgelink Power jointly and severally liable for the award. As the decision explained,

> (a) Bridgelink Commodities. The Agreement is made in the name of Bridgelink Commodities. It defines Bridgelink Commodities as "the Company" and imposes its obligations — including the obligation to pay the Success Fee — on the Company. The Agreement is executed by Cole Johnson, who is the Chief Executive Officer of Bridgelink Commodities and is identified as "Chief Executive Officer" beneath his name on the document. All of those facts are undisputed. (J-1; Statement of Undisputed Facts, ¶ 3, 5)
>
> Above Mr. Johnson's signature on the Agreement is the entity name "Bridgelink Power" not "Bridgelink Commodities". (J-1; Statement of

Undisputed Fact ¶ 5) That discrepancy does not undermine the many facts recited above that obligate Bridgelink Commodities to perform the contractual obligation to pay the Success Fee. Respondents do not so argue, nor do they contest that Bridgelink Commodities is bound by the Agreement. Accordingly, the liability of Bridgelink Commodities has been established.

(b) Bridgelink Power. The liability of Bridgelink Power presents a closer question, because that entity is not included within the definition of "the Company" upon which the Agreement's undertakings are imposed. Nevertheless, the Agreement is signed "Bridgelink Power, by Cole Johnson, Title: Chief Executive Officer". (J-1, p. 5; Statement of Undisputed Facts, ¶ 5) Cole Johnson testified at the Hearing that he signed on behalf of Bridgelink Power. (Tr. 22-23) In the absence of any evidence to the contrary (and there has been none), this is sufficient to bind Bridgelink Power.

Therefore, the liability of Bridgelink Power has likewise been established.

Accordingly, I award the amount of $1,462,500 to Claimant Advance Energy Capital LLC against Respondents Bridgelink Commodities, LLC and Bridgelink Power, LLC, jointly and severally.

62. As discussed in the Iceberg report, Bridgelink Power had defaulted on a secured loan facility and was embroiled in litigation with the lender to seize the parent's assets. That lender (Crayhill) was the entity that Advanced Energy Capital LLC had introduced the Bridgelink entities to and helped to set up the financing for pursuant to its contract with Bridgelink Commodities. As such, it is clear that Bridgelink Commodities was involved in the Bridgelink Power relationship with Crayhill. In fact, Bridgelink Commodities was specifically found jointly and severally liable for significant costs and expenses related to the financing transaction that Bridgelink Power defaulted on, resulting in the litigation over its assets.

63. Moreover, in the lawsuit against Bridgelink Power referenced in the Iceberg report, the plaintiffs in that case which included, Cole Johnson and a half a dozen Bridgelink entities, including Bridgelink Power, admitted that the lawsuit could destroy the entire Bridgelink renewable energy business. As they explained, "Plaintiffs' renewable energy business, worth in excess of $350 million, will be destroyed in the absence of this Court's grant of a temporary

restraining order ("TRO") and preliminary injunction enjoining the sale of Plaintiffs' business through Defendants' UCC sale scheduled for 10:00AM Friday, April 28, 2023." They even further explained that: "If the Public Auction is permitted to proceed, it will destroy Plaintiffs' business, irreparably damage Plaintiffs' reputation and good will, and render ineffectual any future judgment in this action in favor of Plaintiffs, as Plaintiffs' rights and interests in their valuable assets will have long been extinguished through the Public Auction." As Cole Johnson further explained:

> Defendants now stand on the verge of completing their predatory scheme, having scheduled the Public Auction of Plaintiffs' valuable assets for Friday, April 28, 2023 at their lawyers' New York offices. However, the collateral is comprised of 100% of the limited liability interests in Plaintiffs' various LLCs which own PV solar projects and Battery Energy Storage Systems projects. The value of these assets is outlined in an independent Kroll valuation report as of December 31, 2022, which concluded that the mid-value "as is" of all the projects in total exceeds $352 million. It is important to note, however, that the value of these solar development projects, for which construction has not yet begun, is dependent on the vertically integrated Plaintiffs' team's ability to develop these projects to achieve Notice to Proceed. Permitting the Public Auction to move forward will assure incalculable, immeasurable and irreparable harm.

64. The foregoing legal filings and facts show that Bridgelink Power's financial condition significantly impacted Bridgelink Commodities. For example, if Bridgelink Power were unable to pay its legal judgments, Bridgelink Commodities would be responsible for a material amount since the entities were jointly and severally liable. Moreover, Cole Johnson was empowered to bind both Bridgelink Power and Bridgelink Commodities to contracts. Thus, Defendants would have been able to learn of any financial difficulties Bridgelink Commodities (or any Bridgelink entity) faced from Mr. Johnson, including as a result of any troubles impacting its parent company, to assess Eos's ability to realize its backlog of contracts.

## KNOWLEDGE OF THE INDIVIDUAL DEFENDANTS

[redacted]



[3] Thus, Plaintiff seeks to draw the inference that "the substance of the discussion and any decision would favor the plaintiff[']s theory of the case." *Ont. Provincial Council of Carpenters' Pension Trust Fund v. Walton*, C.A. No. 2021-0827-JTL, 2023 Del. Ch. LEXIS 92, at *6-7 (Del. Ch. Apr. 26, 2023) (citing *In re McDonalds Corp. S'holder Deriv. Litig.*, 291 A.3d 652, 697 (Del. Ch. Mar. 1, 2023) ("When the documents from a Section 220 production contain gaps, a plaintiff can seek inferences about what the redacted material might say. A court can credit those inferences, and that outcome could be worse for the defendants than if the Company had produced the documents without redactions.")).



**DAMAGES TO THE COMPANY**

**Securities Class Action**

72. On August 1, 2023, a securities class action complaint was filed in the United States District Court for the District of New Jersey against the Company and the Officer Defendants. The complaints all allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Houck v. EOS Energy Enterprises, Inc., et al.*, Case 3:23-cv-04113 (D. N.J.) ("Securities Class Action").

73. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's former officers. The Company will continue to incur significant sums in relation to the above Securities Class Actions and any liability or settlement that results.

**Unjust Compensation**

74. At all relevant times, the Company paid lucrative compensation to certain of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

75. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *supra*, for which they were compensated for.

76. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was

excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

77. In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

78. The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

79. As a direct and proximate result of the Individual Defendants' conduct, Eos has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## CORPORATE GOVERNANCE

80. At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

81. Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

82. At all relevant times, the Company had in place its Code of Business Conduct and Ethics ("Code of Conduct") which "applies to all … directors, officers and other employees." The Code of Conduct makes clear that it "contains general guidelines for conducting the business of [Eos] consistent with the highest standards of business ethics."

83. From the outset, the Code of Conduct promotes "Reporting Violations of the Code," stating, in relevant part: "All employees and directors have a duty to report any known or suspected violation of this Code, including violations of the laws, rules, regulations or policies that apply to the Company."

84. In a section entitled "Company Records," the Code of Conduct states:

> Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include financial records, personnel records, records relating to our technology and product development, clinical development, customer collaborations, manufacturing and regulatory submissions and all other records maintained in the ordinary course of our business.
>
> All Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control. Please contact your supervisor or the Company's Legal Department to obtain a copy of any such policy or with any questions concerning any such policy.

85. In a section entitled "Accuracy of Financial Reports and Other Public Communications," the Code of Conduct states:

> As a public company, we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

> The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

86. In a section entitled "Compliance with Laws and Regulations," the Code of Conduct states: "Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations."

87. In a section entitled "Regulation FD, and Social Media," the Code of Conduct states, in relevant part:

> In connection with its public communications, the Company is required to comply with a rule under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD provides that, when we disclose material non-public information about the Company to securities market professionals or stockholders (where it is reasonably foreseeable that the stockholders will trade on the information), we must also disclose the information to the public. "Securities market professionals" generally include analysts, institutional investors and other investment advisors.
>
> The Company has designated certain individuals as "spokespersons" who are responsible for communicating with analysts, institutional investors and representatives of the media. Any employee or director who is not a designated spokesperson of the Company should not communicate any information about the Company to analysts, institutional investors or representatives of the media, except at the request of the Company's designated spokespersons. Bear in mind that, when it comes to the securities laws, there is no such thing as a "private," "confidential" or "off the record" conversation.

**Audit Committee Charter**

88. At all relevant times, the Company had in place its Audit Committee Charter which set forth the additional duties and responsibilities of the Audit Committee – comprised of Defendants Bornstein, Demby, Dimitrief and Non-Party Jeff McNeil. The Audit Committee Charter states that the committee's role is to:

> [A]ssist the Board in fulfilling its responsibilities, the Committee shall: (A) oversee: (i) audits of the financial statements of the Company; (ii) the integrity of the Company's financial statements; (iii) the Company's processes relating to risk management and the conduct and systems of internal control over financial reporting and disclosure controls and procedures; (iv) the qualifications, engagement, compensation, independence and performance of the Company's independent auditor, and the auditor's conduct of the annual audit of the Company's financial statements and any other services provided to the Company; and (v) the performance of the Company's internal audit function, if any; and (B) produce the annual report of the Committee required by the rules of the U.S. Securities and Exchange Commission (the "SEC").

89. In a section entitled "Financial Statements and Other Financial Disclosures," the Audit Committee Charter states:

> (i) Quality and Integrity of Financial Statements. The Committee shall review and discuss with management and the independent auditor: the critical accounting policies and practices used by the Company, and any significant changes in the selection or application of the Company's accounting and auditing principles and practices as suggested by the Company's independent auditor, internal auditors, if any, or management; the accounting treatment to be applied in respect of significant new transactions or other significant events not in the ordinary course of the Company's business; other policies and procedures adopted by the Company to fulfill its responsibilities regarding the presentation of financial statements in accordance with GAAP and applicable rules and regulations of the SEC, including the proper explanation and reconciliation of any non-GAAP measures presented; and any issues that arise with respect to the quality or integrity of the Company's financial statements.
>
> (ii) Audited Financial Statements. The Committee shall review and discuss with management and the independent auditor, before the issuance of the audit report, the financial statements and related notes and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" proposed to be included in the Company's Annual Report on Form 10-K. In this connection, the Committee shall review and discuss with management and the independent auditor the analyses prepared by management setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements (including analyses of the effects of alternative GAAP methods on the financial statements), and such other matters for which discussion shall be required by applicable auditing and related PCAOB standards. The Committee shall make a recommendation to the Board as to whether such financial statements should be included in the Company's Annual Report on Form 10-K.
>
> (iv)[sic] Quarterly Financial Statements. The Committee shall review and discuss with management and the independent auditor the quarterly financial statements

> and related notes and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" proposed to be included in the Company's Quarterly Reports on Form 10-Q, together with the analyses prepared by management setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, and such othermatters for which discussion shall be required by applicable auditing standards and related PCAOB standards.
>
> (v) Earnings Releases and Other Financial Information. The Committee shall discuss with management and the independent auditor and, prior to issuance, review and approve the Company's earnings releases, including the financial information, use of any "pro forma" or "adjusted" non-GAAP information, and earnings guidance (if such is provided) to be disclosed in such releases. The Committee shall also discuss with management other significant financial information to be provided to analysts or rating agencies.
>
> (vi) Payments. The Committee shall review on a quarterly basis all payments made to the Company's sponsor, officers or directors, or to the Company's or their affiliates.

90. In a section entitled "Controls and Procedures," the Audit Committee Charter states:

> (i) Oversight. The Committee shall provide oversight of management's design and maintenance of the Company's internal control over financial reporting and disclosure controls and procedures. Prior to the filing of the Company's Annual Report on Form 10-K, the Committee shall review with the independent auditor, management and the head of the internal audit function, if any: the Company's annual assessment and report and the independent auditor's report on the effectiveness of the Company's internal control over financial reporting, to the extent then applicable; any "material weakness" or "significant deficiency" in the design or operation of internal control over financial reporting, any steps taken to resolve any such control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting; and any related significant findings and recommendations of the independent auditor or internal audit function, if any, together with management's responses (including, in the case of the independent auditor, any concerns regarding matters within the scope of, and compliance with, Section 10A of the Exchange Act).
>
> ***
>
> (iii) Internal Audit Function. At least annually, the Committee shall review with the independent auditor the responsibilities, budget, staffing, effectiveness and performance of the internal audit function, if any, including the structure, qualification and activities of the internal audit function and the scope of internal

> audit responsibilities in relation to the independent auditor's duties. The Committee shall review and assess the annual internal audit plan, if any, the process used to develop the plan, and the status of activities, significant findings, recommendations and management's response. The Committee shall recommend for Board approval all matters related to responsibilities, budget and staffing of the internal audit function, if any. The Committee shall recommend for Board approval the appointment and, if appropriate, replacement of the senior internal audit executive.

91. In a section entitled "Risk Management, Compliance and Ethics," the Audit Committee Charter states:

> (i) Risk Management. The Committee shall review and discuss with management, the head of the internal audit function, if any, and the independent auditor any significant risks or exposures and the Company's policies and processes with respect to risk assessment and risk management, and shall assess the steps management has taken to monitor and control such risks, except with respect to those risks for which oversight has been assigned to other committees of the Board or retained by the Board. The Committee shall review the Company's annual disclosures concerning the role of the Board in the risk oversight of the Company.
>
> (ii) Legal and Regulatory Compliance. The Committee shall review and assess with the Chairman, Co-Chairman or Co-Executive Chairman of the Board or outside counsel, as appropriate, legal and regulatory matters that may have a material impact on the Company's financial statements. The Committee shall also review and recommend for Board, in consultation with the Nominating and Corporate Governance Committee, approval the code of business conduct and ethics and any other appropriate compliance policies, and will review requests for waivers under the code of business conduct and ethics sought with respect to any executive officer or director. The Committee shall review annually with the Chairman, Co-Chairman or CoExecutive Chairman of the Board or outside counsel, as appropriate, the scope, implementation and effectiveness of the ethics and compliance program, and any significant deviations by officers and employees from the code of business conduct and ethics or other compliance policies, and other matters pertaining to the integrity of management.
>
> (iii) Procedures for Complaints. The Committee shall establish "whistleblowing" procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and (b) the confidential, anonymous submission by the Company's employees of concerns regarding questionable accounting, auditing or other integrity-related matters. The Committee shall review any such significant complaints or concerns.
>
> (iv) Review and Approval of Swap Transactions. The Committee shall at least annually review and approve the Company's decision to enter into swaps and other derivative transactions that are exempt from exchange-execution and clearance

requirements under "end-user exception" regulations, and review and discuss with management applicable Company policies governing the Company's use of swaps subject to the end-user exception.

**DUTIES OF THE DIRECTOR DEFENDANTS**

92. As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

93. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

94. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

95. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

96. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

97. Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

98. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

99. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

100. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

101. Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of

conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

102. During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants. Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

103. The Company Board is currently comprised of nine (9) members – including Defendants Stildoph, Bornstein, Demby, Dimitrief, Mastrangelo, Walters, and Non-Parties Jeff McNeil, Gregory Nixon and Nick Robinson (collectively, the "Current Directors"). Thus, Plaintiff is required to show that a majority of the Current Directors, *i.e.*, five (5), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

104. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

105. The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

106. Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial

condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

107. As a trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

108. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

109. Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

110. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

111. Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed and refused to seek recovery for the

Company for any of the misconduct alleged herein.

**THE DIRECTOR DEFENDANTS ARE**
**NOT INDEPENDENT OR DISINTERESTED**

**Defendant Mastrangelo**

112. Defendant Mastrangelo is not disinterested or independent, and therefore, is incapable of considering demand because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with Eos, making him not independent. As such, Defendant Mastrangelo cannot independently consider any demand to sue himself for breaching his fiduciary duties to Eos, because that would expose him to liability and threaten his livelihood.

113. As CEO, Defendant Mastrangelo also fails the NASDAQ bright-line independence test and cannot, therefore, be considered independent, as admitted by the Company in its 2024 Proxy Statement. As such, Defendant Mastrangelo could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Mastrangelo is therefore futile.

114. Defendant Mastrangelo also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Mastrangelo is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

115. In addition, Defendant Mastrangelo receives lucrative compensation in connection with his employment with the Company. Defendant Mastrangelo is not independent from Defendants Bornstein, Stidolph, Walters, and Non-Party Jeff McNeil as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation

of the CEO and Executive Officers, including Defendant Mastrangelo. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Mastrangelo could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

116. Because of Defendant's Mastrangelo's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Mastrangelo is unable to comply with his fiduciary duties and prosecute this action. Defendant Mastrangelo is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

**Defendants Stidolph, Bornstein and Demby**

117. Defendants Stidolph, Bornstein, and Demby each personally benefitted from the wrongdoing alleged herein and cannot, therefore, consider a demand to sue. Specifically, the 2023 Proxy Statement contained false and misleading statements regarding the Board's risk oversight function and adherence to the Company's Code of Conduct. In fact, the statements contained in the 2023 Proxy Statement were half-truths and/or completely false and misleading. As a result of these false and misleading statements, however, the Company's shareholders voted in favor of re-electing Defendants Stidolph, Bornstein, and Demby to the Board, thus enabling them to continue breaching their fiduciary duties to the Company and receiving lucrative compensation. As such, Defendants Stidolph, Bornstein, and Demby personally benefitted from the false and misleading 2023 Proxy Statement, face a likelihood of liability therefor, and are otherwise conflicted.

**Defendants Bornstein, Demby, Dimitrief and Mastrangelo**

118. Defendants Bornstein, Demby, Dimitrief, and Mastrangelo are each conflicted by virtue of their longstanding business relationships with each other through their overlapping employment with General Electric ("GE") and its subsidiaries. Specifically, Defendant Bornstein worked within GE Power Systems from 1989 to 1992, as GE Corporate Audit Staff from 1992 to 1996, in GE Aircraft Engine Services from 1996 to 1998, as CFO of GE Plastics from 1999 to 2002, as CFO of GE Capital for 12 years thereafter, and finally as CFO of GE from 2013 to 2017. Similarly, Defendant Dimitrief worked within GE's legal department from 2011 to 2012 before becoming the Chief Legal Officer ("CLO") for GE Capital from 2012 to 2015 (while Bornstein was CFO), and finally became CEO of GE's Global Growth Organization from 2015 to 2019. At the same time, Defendant Mastrangelo had a long career with GE, beginning in 1993 with GE Financial Management until 1995 when he joined GE's Corporate Audit Staff (at the same time as Defendant Bornstein). In 2000, Defendant Mastrangelo joined GE Oil & Gas serving in various leadership roles before serving as CEO of GE's Power Conversion business from 2011 to 2015 and, finally, serving as CEO of GE's Gas Power Systems from 2015 through 2018. Finally, Defendant Demby reportedly "began his career in engineering roles with … GE Plastics."

119. As a result of these Defendants' overlapping senior and executive service with GE and its subsidiaries, each of the Defendants have built professional relationships with one another and are thus indebted to each other and could not reasonably and objectively consider a demand to sue each other for the wrongdoing alleged herein. As such, demand is futile as to each of them.

**Non-Parties Robinson and Nixon**

120. Non-Party Robinson presently serves as a Managing Director of Cerberus Capital Management. Non-Party Nixon also serves as Head of Strategic Investments for Cerberus Capital Management. As noted in the Company's 2024 Proxy Statement, Cerberus Capital Management

is "the holder of Preferred Stock and Warrants." As such, [REDACTED]

[REDACTED]

Accordingly, both Non-Parties Robinson and Nixon [REDACTED]

[REDACTED] and could not independently nor objectively consider a demand to sue. Indeed, the Company admits in its 2024 Proxy Statement that "Messrs. Nixon and Robinson may have interests in the Financing and Cerberus' relationship with the Company that are different from, or in addition to, the interests of other of our stockholders of the Company[,]" further underscoring Non-Parties Robinson and Nixon's lack of independence.

**Defendants Bornstein, Demby and Dimitrief**

121. During the Relevant Period, Defendants Bornstein, Demby and Dimitrief served as members of the Audit Committee (the "Audit Committee Defendants"). Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

122. The Audit Committee Defendants breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties

and any demand upon them is futile.

**Additional Reasons Demand is Futile**

123. [REDACTED] As such, the Director Defendants not only face a substantial likelihood of liability, but clearly cannot exercise objective and independent judgment. Thus, demand is excused as to each of them.

124. Each of the Director Defendants solicited the 2023 Proxy Statement which contained false and misleading statements regarding the Board's risk oversight function and adherence to the Company's Code of Conduct, as alleged herein. As a result of the false and misleading statements, Company shareholders voted in favor of, *inter alia*, amending the Company's exculpation provision to afford the Company's executives greater protection from their wrongdoing. As such, each of the Director Defendants have benefitted from their wrongdoing through attempting to gain stronger legal immunity in their roles. Such actions could not be the product of good faith business judgment and further reflect the Director Defendants' conflicts which prevent them from instituting and maintaining a lawsuit against one another.

125. The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Directors have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer

thereby.

126. The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

127. In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

128. The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

129. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

130. Publicly traded companies, such as Eos, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Current Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

131. Accordingly, each of the Current Directors, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Current Directors is futile and, thus, excused.

## CLAIMS FOR RELIEF

## COUNT I

### (Against the Individual Defendants for Breach of Fiduciary Duties)

132. Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

133. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest

obligation of good faith, fair dealing, loyalty, and due care.

134. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

135. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

136. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

137. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

**COUNT II**

**(Against the Individual Defendants for Gross Mismanagement)**

138. Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

139. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the

operations of a publicly held corporation.

140. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

141. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

**COUNT III**

**(Against the Individual Defendants for Waste of Corporate Assets)**

142. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

144. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend their unlawful actions.

145. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**COUNT IV**

**(Against the Individual Defendants for Unjust Enrichment)**

146. Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

147. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

148. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

149. Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

**COUNT V**

**(Against the Individual Defendants for Aiding and Abetting)**

150. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

151. The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Officer Defendants. Likewise, the Officer Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Director Defendants.

152. Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially

false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing to report the same.

153. The Officer Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Officer Defendants' lack of oversight and scheme to issue materially false and misleading statements to the Company's shareholders to secure, *inter alia*, the re-election of certain Director Defendants, by facilitating and disguising the Director Defendants' violations of law as alleged herein, and failing to report the same.

154. As a result, the Director Defendants substantially assisted the Officer Defendants, and the Officer Defendants substantially assisted the Director Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

155. As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT VI

**(Against the Director Defendants for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R. § 240.14a-9)**

156. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

157. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

158. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

159. The Director Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

160. The Director Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2023 Proxy Statement filed with the SEC.

161. The 2023 Proxy Statement was used to solicit shareholder votes in connection with, *inter alia*: (1) the re-election of certain Director Defendants to the Board; and (2) the ratification of the selection of the Company's independent registered public accounting firm for its fiscal year ending December 31, 2023; (3) the compensation of the Company's named executive officers; (4) an amendment to the Company's Third Amended and Restated Certificate of Incorporation to update the exculpation provision; and (5) an amendment to the Company's Amended and Restated 2020 Incentive Plan.

162. In discussing Risk Oversight, the 2023 Proxy Statement failed to disclose Bridgelink Power, the parent company of Eos' largest customer, Bridgelink Commodities, defaulted on a secured loan facility and was embroiled in litigation with the lender to seize the parent's assets and that the foregoing threatened Bridgelink Commodities' commitment and ability

to purchase Eos products. As a result, there was a material risk to Eos's backlog which was vital to the future of the Company, which was known, or should have been known to the Director Defendants in the exercise of prudent business judgment. As such, the foregoing statement in the 2023 Proxy Statement was a half-truth, meaning that the Director Defendants were required to (yet failed to) include all additional information necessary to make the statement not misleading. *See* 17 C.F.R. § 240.12b-20.

163. Furthermore, the Director Defendants' statement regarding the Company's Code of Conduct was materially false and misleading because the Director Defendants were not adhering to the Code of Conduct and were, in fact, acting in violation of the Code of Conduct.

164. In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading.

165. As a result of the Director Defendants causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*: (i) to re-elect Defendants Stidolph, Bornstein, and Demby to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (ii) to approve, on an advisory basis, the compensation for the named executive officers; and (iii) to update the Company's exculpation provision which would provide "exculpation to officers of the Company "to the fullest extent permitted by law.""

166. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Determining that this action is a proper derivative action maintainable under

law, and that demand is excused;

B. Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and aiding and abetting;

C. Awarding, against all Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Director Defendants' violations of § 14(a) of the Exchange Act;

D. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 5, 2024

**GAINEY McKENNA & EGLESTON**

By: */s/ Barry Gainey*
Barry Gainey
375 Abbott Road
Paramus, NJ 07652
Tel.: (201) 225-9001
Fax: (201) 225-9002
Email: bgainey@gme-law.com

Thomas J. McKenna
Gregory M. Egleston
260 Madison Ave., 22nd Floor
New York, NY 10016
Tel.: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***

**VERIFICATION**

I, JUNG JAE HYUNG, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Eos Energy Enterprises, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do no have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Eos Energy Enterprises, Inc. common stock at all relevant times.

JUNG JAE HYUNG